**William DAVID et al., Plaintiffs,**

**v.**

**William T. CAHILL, Governor of the State of New Jersey, et al., Defendants,**
**James J. Howard et al., Intervenors.**

**Civ. A. No. 1914-71.**

United States District Court, D. New Jersey, Civil Division.

March 16, 1972.

Memorandum April 12, 1972.

As Amended April 26, 1972.

Brown, Vogelman, Morris & Ashley, Jersey City, N. J., for plaintiffs; by Raymond A. Brown, and Irving I. Vogelman, Jersey City, N. J.

Warren, Goldberg & Berman, Trenton, N. J., for defendants; by David J. Goldberg, Trenton, N. J.

Farley & Rush, Newark, N. J., for John E. Hunt, Charles W. Sandman, Peter Frelinghuysen, Edward B. Forsythe, William B. Widnall and Florence B. Dwyer; by Thomas R. Farley, Newark, N. J.

George F. Kugler, Jr., Atty. Gen., for William T. Cahill, Paul J. Sherwin, and William Yeomans and the Essex County Board of Elections; by Morton I. Greenberg, Asst. Atty. Gen., Trenton, N. J.

### MEMORANDUM AND ORDER

Before GIBBONS, Circuit Judge, and GARTH and FISHER, District Judges.

### PER CURIAM.

In this action the plaintiffs, citizens, residents, and registered voters of New Jersey, suing on their own behalf and on behalf of all those similarly situated, seek a declaration of unconstitutionality and an injunction against enforcement of N.J.S. 19:46–3, which creates districts for the election of United States Representatives from New Jersey. Jurisdiction is asserted under 28 U.S.C. § 1343. The initial defendants were the Governor of the State, the Secretary of State, the Superintendent of Elections of Essex County and the Essex County Board of Elections. The Attorney General of New Jersey has appeared on behalf of these defendants. On motion this court permitted incumbent members[1] of the House of Representatives from New Jersey to intervene as defendants. The Democratic members, James J. Howard, Frank Thompson, Jr., Robert A. Roe, Henry Helstoski, Peter W. Rodino, Jr., Joseph G. Minish, Dominick V. Daniels and Edward J. Patten are represented by Warren, Goldberg & Berman, Esqs. The Republican members, John E. Hunt, Charles W. Sandman, Peter Frelinghuysen, Edwin B. Forsythe, William B. Widnall and Florence P. Dwyer, are represented by Farley & Rush, Esqs. All defendants have stipulated that the plaintiffs have standing and are appropriate class representatives. All parties have joined in a stipulation of facts, and all have conceded that they would offer no evidence except for that contained in the stipulation of facts bearing upon the constitutionality of the congressional districting plan set forth in N.J.S. 19:46–3. In the stipulation these facts appear:

New Jersey is divided into fifteen congressional districts. The 1970 Federal Census as corrected by the Bureau of Census as of January 3, 1972 establishes New Jersey's population at 7,170,885. With this population an ideal district based upon population would contain 478,059. In fact the population, deviation from the ideal, and percentage of relative deviation of New Jersey's fifteen districts is as follows:

| District | Population | Deviation | % of Rel. Deviation |
|---|---|---|---|
| 1 | 483,518 | + 5,459 | + 1.14 |
| 2 | 416,317 | — 61,742 | —12.92 |
| 3 | 558,176 | + 80,117 | +16.76 |
| 4 | 525,322 | + 47,263 | + 9.89 |
| 5 | 581,826 | +103,767 | +21.71 |
| 6 | 629,444 | +151,385 | +31.67 |
| 7 | 463,475 | — 14,584 | — 3.05 |
| 8 | 460,782 | — 17,277 | — 3.61 |
| 9 | 433,673 | — 44,386 | — 9.28 |
| 10 | 441,960 | — 36,099 | — 7.55 |
| 11 | 383,082 | — 94,977 | —19.87 |
| 12 | 467,196 | — 10,863 | — 2.27 |
| 13 | 392,626 | — 85,433 | —17.87 |
| 14 | 398,390 | — 79,669 | —16.67 |
| 15 | 535,098 | + 57,039 | +11.93 |
| Total | 7,170,885 | | |
| Mean per cent of relative deviation | | | 12.41 |

---

1. The notice of motion to intervene did not list the incumbent congressman from the 13th district Cornelius E. Gallagher, a Democrat. Subsequent papers filed in the cause indicate that the firm of Warren, Goldberg & Berman does represent Mr. Gallagher.

Patently the congressional districting plan set forth in N.J.S. 19:46–3 is unconstitutional. Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969).

New Jersey provides for primary elections. N.J.S. 19:23–1 et seq. Petitions nominating candidates to be voted for by the voters of a political party in any congressional district are addressed to the Secretary of State. N.J.S. 19:23–6. The petitions must set forth that the signers are qualified voters of the congressional district for which they desire to nominate a candidate. N.J.S. 19:23–7. For congressional primaries two hundred signatures are required. N.J.S. 19:23–8. Petitions must be filed with the Secretary of State before 4:00 P.M. on the fortieth day next preceding the holding of the primary election. Since that election is scheduled for June 6, 1972, N.J.S. 19:23–40, the last filing date would be April 27, 1972.

■ We have held that the congressional districting plan is unconstitutional. Since the first step in the congressional electoral process is the filing of nominating petitions signed by party members who are residents of a congressional district, and since the present congressional districts are unconstitutionally constituted, no valid step may be taken with respect to nomination of congressional candidates.

Therefore it is ORDERED

1. That the Secretary of State of New Jersey be and is hereby enjoined and restrained, pending the further order of this court, from receiving or filing nominating petitions for candidates for membership in the House of Representatives for the primary election now scheduled for June 6, 1972.

2. That each of the defendants be and are hereby enjoined and restrained, pending the further order of this court from taking any steps looking toward the nomination of candidates in the primary election or the election of candidates in the general election for the office of member of the House of Representatives from the congressional districts presently created by N.J.S. 19:46–3.

3. That this court shall hold a hearing at the United States Post Office and Courthouse, Courtroom No. 8, on Monday, April 3, 1972 beginning at 10:00 A.M., or as soon thereafter as counsel may be heard with respect to other or further relief.

4. That any party who intends to submit for consideration by the court any plan or program whereby the court may approve or initiate a method for carrying out the primary and general elections for members of the House of Representatives from New Jersey either from districts or at large shall file such a plan or program with the Clerk of the United States District Court, at Newark, New Jersey, and serve copies on the attorneys for all parties to this action, no later than 4:00 P.M. on March 30, 1972, together with a memorandum setting forth the proponents' contentions as to how the plan conforms with Article I, Section 2 of the United States Constitution.

### MEMORANDUM and FINAL JUDGMENT

PER CURIAM.

In this action the plaintiffs, citizens, residents, and registered voters of New Jersey, suing on their own behalf and on behalf of all those similarly situated, sought a declaration of unconstitutionality and an injunction against enforcement of N.J.S. 19:46–3, which creates districts for the election of United States Representatives from New Jersey. Jurisdiction is asserted under 28 U.S.C. § 1343. The initial defendants were the Governor of the State, the Secretary of State, the Superintendent of Elections of Essex County and the Essex County

Board of Elections. The Attorney General of New Jersey appeared on behalf of these defendants. On motion this court permitted incumbent members [1] of the House of Representatives from New Jersey to intervene as defendants. The Democratic members, James J. Howard, Frank Thompson, Jr., Robert A. Roe, Henry Helstoski, Peter W. Rodino, Jr., Joseph G. Minish, Dominick V. Daniels and Edward J. Patten are represented by Warren, Goldberg & Berman, Esqs. The Republican members, John E. Hunt, Charles W. Sandman, Peter Frelinghuysen, Edwin B. Forsythe, William B. Widnall and Florence P. Dwyer, are represented by Farley & Rush, Esqs. All defendants have stipulated that the plaintiffs have standing and are appropriate class representatives. All parties joined in a stipulation of facts, and all conceded that they would offer no evidence except for that contained in the stipulation of facts bearing upon the constitutionality of the congressional districting plan set forth in N.J.S. 19:46–3.

We held that the congressional districting plan set forth in N.J.S. 19:46–3 was, under the standards announced in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), patently unconstitutional. We enjoined the defendants from taking any steps pending the further order of this court, looking toward the nomination of candidates in the primary election or the election of candidates in the general election for the office of member of the House of Representatives from the districts set forth in N.J.S. 19:46–3. We set the case down for a hearing, beginning on April 3, 1972, with respect to other or further relief, and invited the parties to submit for our consideration any plan or program whereby we could approve or initiate a method for carrying out the primary and general elections for members of the House of Representatives for New Jersey. Pursuant to that invitation the intervening Democratic congressmen, the incumbent Republican congressmen, the Secretary of State of New Jersey, the plaintiffs, a number of interested citizens, and a labor organization submitted districting plans for consideration. We permitted the filing of each of these plans, and we have examined all of them. At the hearing a number of interested citizens and one labor organization moved to intervene as parties. We denied these last minute motions to intervene but suggested that any witnesses which might be available in support of any suggested plan should be called to the attention of the parties to the lawsuit. In the hearing we heard the testimony of five witnesses.

Alexander Allen, the Clerk of Bergen County, testified about the difficulties which would be encountered by the election officials of the various counties if we were to order the congressional election to be held at large rather than from single member districts. *Cf.* 2 U.S.C. § 2c. Since we have concluded that it is feasible for us to enter an order establishing single member districts from which the 1972 congressional primary and general elections may be held, no further reference will be made to Mr. Allen's testimony.

The other witnesses were Samuel A. Alito, Research Director of the Law Revision and Legislative Services Agency of the New Jersey Legislature, Henry Claubagh Hiles, a researcher on reapportionment problems for the Lawyers Committee for Civil Rights under Law of Washington D. C., Joseph Gannon, Director of Staff for the Democratic Assembly delegation of the New Jersey Legislature, and Dr. Michael Rappeport, a consultant on reapportionment problems and on opinion research for various organizations.

---

1. The notice of motion to intervene did not list the incumbent congressman from the 13th district Cornelius E. Gallagher, a Democrat. Subsequent papers filed in the cause indicate that the firm of Warren, Goldberg & Berman does represent Mr. Gallagher.

Mr. Alito's testimony was offered on behalf of the defendant Sherwin, Secretary of State of New Jersey, to establish the accuracy of the population statistics in several plans, all essentially modifications of a basic redistricting proposal which had substantial Republican sponsorship. His testimony established, however, that he was, as Research Director for the Law Revision and Legislative Services Agency, essentially neutral. That office maintains geographic and census data from which it can assist any legislator, Republican, Democratic, or Independent, in the drafting of districting legislation, and it had lent a neutral hand in the drafting of many of the plans submitted to us. Mr. Alito properly declined to assist the court by drafting a districting plan, because such a role would be incompatible with the neutrality required by his office. He did, however, with the consent of all parties, render invaluable assistance to the court in verifying the census and geographic data of each of the plans on which we heard testimony.

Mr. Hiles testified on behalf of the plaintiffs to establish the population deviation, contiguity and compactness of districts suggested in five plans prepared by him at their request and with respect to population deviation of the districts suggested in a sixth plan, embodied in New Jersey Assembly Bill No. 843. He also testified with respect to criteria other than minimum population deviation, compactness and contiguity which he thought to be appropriate districting criteria.

Mr. Gannon testified on behalf of the Democratic incumbent congressmen in favor of several plans prepared by various Democratic interests. Like Mr. Alito and Mr. Hiles he had become quite expert in the arithmetic of redistricting. He urged that an important consideration in redistricting should be the preservation of as much of the core of former districts in new districts as is possible in the light of population shifts.

Dr. Rappeport testified on behalf of the plaintiffs, expressing his opinion as to appropriate neutral criteria for redistricting beyond minimum population deviation.

We received evidence about a number of plans, which may be divided into these categories:

1. Senate Bill 744 (Exhibit DS2) and various refinements. This basic Bill was introduced in the New Jersey Senate by Senator Beadleston, passed that house, but failed of passage in the assembly. It had essentially Republican sponsorship.

2. Senate Bill 741 (Exhibit P 3) and various refinements. The basic Bill was introduced in the Senate by Senator Crabiel. It passed neither house of the legislature. It had essentially Democratic sponsorship.

3. The plaintiffs' "Plan 2" (Exhibit P 7) and various refinements. This plan was never considered by the legislature.

4. Assembly Bill 843 (P. 13) and various refinements. This Bill was introduced in the Assembly by Assemblymen Baer, Burstein and Hynes. It had essentially Democratic sponsorship, but was apparently suggested as attractive to most of the incumbent congressmen. It passed neither house of the legislature.

5. Senate Bill 827 (D S 5). This Bill was introduced in the Senate by Senator Turner. It has passed neither house of the legislature. It was filed with the Clerk by John A. Woolf, one of the applicants for intervention, and was introduced in evidence on behalf of the defendant Sherwin during the cross examination of Mr. Gannon with respect to Assembly Bill 843.

Some of the plans filed with the court but not received in evidence appear to be variations of one of the five basic plans listed above. Some others appear to be entirely different from any

of the above. Because of the exigencies of time and the unavailability to the court of means of verifying the population figures listed in those plans filed but not received in evidence we have restricted our consideration to those received in evidence. As to the latter we have had the assistance of Mr. Alito in checking the population figures against the census data for each district.

We find these facts:

1. The population of New Jersey in the 1970 decennial census as corrected by the Bureau of Census as of January 3, 1972, is 7,170,885.

2. The ideal district size, based on population, is 478,059 people.

3. New Jersey is organized into twenty one counties which are subdivided into some 567 municipalities. There are no unincorporated territories.

4. The population of the counties in the 1970 census, as corrected as of January 3, 1972, in order of magnitude is as follows:

| | |
|---|---|
| Essex | 932,299 |
| Bergen | 897,148 |
| Hudson | 609,266 |
| Middlesex | 583,813 |
| Union | 543,116 |
| Monmouth | 461,849 |
| Passaic | 460,782 |
| Camden | 456,291 |
| Morris | 383,454 |
| Burlington | 323,132 |
| Mercer | 303,968 |
| Ocean | 208,470 |
| Somerset | 198,372 |
| Atlantic | 175,043 |
| Gloucester | 172,681 |
| Cumberland | 121,374 |
| Sussex | 77,528 |
| Warren | 73,960 |
| Hunterdon | 69,718 |
| Salem | 60,346 |
| Cape May | 59,554 |

5. The only county which lost population since the 1960 census was Hudson, which declined from 610,-734 to 609,266. Essex County in the same period remained relatively stable, increasing from 923,-545 to 932,299. This stability reflects, however, increases in the western and northern suburbs which offset a decrease in population in the City of Newark from 405,220 to 381,930. Bergen County gained in population from 780,-255 in 1960 to 897,148 in 1970.

6. Under the districting plan which we have held to be unconstitutional the three counties in the northeast corner of the State, Bergen, Hudson and Essex, are represented by six congressmen. Hudson is represented by two congressmen, with the former thirteenth district borrowing population from Union County. Union County increased in population from 504,255 in 1960 to 543,116 in 1970. Union is separated from Hudson not only by a county line, but by Newark Bay, a substantial geographic barrier. It is clear that with increases in population having taken place elsewhere the redistricting approach of annexing part of a growing county to Hudson in order to maintain two congressional seats for that county is inequitable. Northern Hudson County is not separated by any geographic barriers from Bergen County. No more than five congressional seats may be allocated to the core populations of Bergen, Hudson and Essex.

7. It is impossible to redistrict on a basis which will preserve all county lines. Five counties, Essex, Bergen, Hudson, Middlesex and Union, are substantially larger than the ideal district. Thirteen counties, Morris, Burlington, Mercer, Ocean, Somerset, Atlantic, Gloucester, Cumberland, Sussex, Warren, Hunterdon, Salem and Cape May are substantially smaller than the ideal district. Three counties Monmouth, Passaic, and

Camden approach the ideal district size but in each case adjoin counties which are so large they must be split or so small they must be combined with areas having additional population.

8. Because of the large number and relatively small area of New Jersey's municipalities it is possible to redistrict in many different ways while preserving most municipal lines. Preservation of such lines is desirable not only for the purpose of simplifying the electoral machinery but also because these local governmental units represent, in this state with a strong home rule tradition, logical centers of community interest.

 We have considered as appropriate for redistricting these criteria:

A. Minimum population deviation among districts.

B. Contiguity and compactness of districts.

C. The preservation of whole municipalities in single districts wherever possible.

D. Minimum fragmentation of counties.

E. Recognition of increases in population in newer communities and of decreases in population in older communities

F. Use as a starting point of the last legislative determination of appropriate districts.

Except for criterion A, minimum population deviation, which is of course paramount, no exact order of priorities for these criteria can be established. The task is a balancing one. Moreover there is an almost limitless number of possible combinations whereby a balance may be achieved. The practical limitations of the judicial process dictate that

we make a choice on the evidence before us. One of the plans in evidence, DS 5, represents in our judgment the best balancing of the criteria we have listed. It achieves the following population per district, deviation from the ideal, and percentage of deviation:

| District | 1970 Population | Deviation | % of Deviation |
|---|---|---|---|
| 1 | 478,002 | − 57 | −.012 |
| 2 | 478,126 | + 67 | +.014 |
| 3 | 478,069 | + 10 | +.002 |
| 4 | 478,221 | +162 | +.034 |
| 5 | 478,007 | − 52 | −.011 |
| 6 | 478,109 | + 50 | +.010 |
| 7 | 478,157 | + 98 | +.020 |
| 8 | 478,444 | +385 | +.081 |
| 9 | 478,098 | + 39 | +.008 |
| 10 | 477,730 | −329 | −.069 |
| 11 | 478,097 | + 38 | +.008 |
| 12 | 477,887 | −172 | −.036 |
| 13 | 478,245 | +186 | +.039 |
| 14 | 477,744 | −315 | −.066 |
| 15 | 477,949 | −110 | −.023 |
| | 7,170,885 | | .029 |

These small population deviations are not significant. The plan set forth in DS 5 follows most former district lines as nearly as any we have considered, and leaves a substantial core of constituents in all former districts except the new Thirteenth District. It leaves all municipalities except one in a single congressional district. This one municipality, South Hackensack, is a township consisting of three non-contiguous areas. One such area is in the proposed Ninth District, while the other two are in the proposed Seventh District.[2] We have verified from official sources that the part of South Hackensack in the proposed Ninth District comprises unpopulated marshland beside the Hackensack River. Thus a shift of that part of South Hackensack to the Ninth District for the purpose of maintaining district contiguity has no real effect upon the maintenance of municipalities in single districts. The plan set forth in DS 5 also achieves the result of reducing con-

2. Senate Bill No. 827 (DS 5) placed the three non-contiguous segments of the municipality of South Hackensack within the Seventh Congressional District even though this resulted in one of those seg- ments becoming an island geographically located in and entirely surrounded by the Ninth Congressional District. Our adaptation of this plan incorporates that island into the surrounding Ninth District.

gressional seats in Bergen, Hudson and Essex from six to five, of recognizing the growth in population which has taken place to the west and south of these counties, and of disturbing to a minimum degree existing constituencies. It places only two incumbent congressmen, in Hudson County, in the same district. Every incumbent congressman is a resident of one of the proposed new districts. Only one entirely new district is created, in the Northwest quadrant of the State. In that new district there is no incumbent, and so far as we know, no favored candidate.

It is, therefore, ordered, adjudged and decreed that the defendants, William T. Cahill, Paul J. Sherwin, William F. Yeomans, and the Essex County Board of Elections, and all election officials of the State of New Jersey acting in concert with or under the supervision of any of them shall conduct the primary election on June 6, 1972 to choose candidates for membership in the House of Representatives from New Jersey, and the general election on November 7, 1972 for membership in the House of Representatives, from the following single member districts:

First. The county of Gloucester and that portion of the county of Camden not contained in the Sixth District, shall constitute and be called the First District.

Second. The counties of Atlantic, Cape May, Cumberland and Salem, and that portion of the county of Burlington embracing Bass River, Washington, Woodland, and that portion of the county of Ocean not contained in the Third and Sixth Districts, shall constitute and be called the Second District.

Third. All that portion of the county of Monmouth not contained in the Fourth District, and that portion of the county of Ocean embracing Lakewood, Point Pleasant, and Point Pleasant Beach, shall constitute and be called the Third District.

Fourth. That portion of the county of Burlington embracing Bordentown city, Bordentown township, Burlington city, Burlington township, Chesterfield, Eastampton, Fieldsboro, Florence, Mansfield, New Hanover, North Hanover, Springfield, Westampton, Wrightstown, and that portion of the county of Mercer not contained in the Fifth, and Thirteenth Districts, and that portion of the county of Middlesex embracing East Brunswick, Helmetta, Jamesburg, Madison township, Milltown, Monroe, South River, Spotswood, and that portion of the county of Monmouth embracing Allentown, Keyport, Matawan township, Roosevelt and Upper Freehold, shall constitute and be called the Fourth District.

Fifth. The county of Somerset and that portion of the county of Essex embracing Livingston and Millburn township, and that portion of the county of Mercer embracing Princeton, Princeton township, West Windsor, and that portion of the county of Middlesex embracing Dunellen borough and Middlesex borough, and that portion of the county of Morris embracing Chatham borough, Chatham township, Florham Park, Hanover township, Harding township, Madison borough, Mendham borough, Mendham township, Morris Plains borough, Morristown, Morris township, Mountain Lakes, Parsippany-Troy Hills township, Passaic township, shall constitute and be called the Fifth District.

Sixth. All that portion of the county of Burlington not contained in the Second and Fourth Districts, and that portion of the county of Camden embracing Cherry Hill, Collingswood, Haddon township, Lawnside, Merchantville, Pennsauken, Audubon Park, Magnolia, and that portion of the county of Ocean embracing Bay Head, Brick township, Dover township, Jackson township, Lavallette, Mantoloking and Plumstead, shall constitute and be called the Sixth District.

Seventh. That portion of the county of Bergen not contained in the Eighth, Ninth and Eleventh Districts, shall constitute and be called the Seventh District.

Eighth. That portion of the county of Bergen embracing Garfield and Wallington, and that portion of the county of Passaic not contained in the Eleventh District, shall constitute and be called the Eighth District.

Ninth. That portion of the county of Bergen embracing Alpine, Bergenfield, Carlstadt, Cliffside Park, Closter, Cresskill, Demarest, Dumont, East Rutherford, Edgewater, Englewood, Englewood Cliffs, Fairview, Fort Lee, Harrington Park, Haworth, Leonia, Little Ferry, Lyndhurst, Moonachie, New Milford, Northvale, Norwood, Old Tappan, Palisades Park, Park Ridge, Ridgefield, River Edge, River Vale, Rockleigh, Rutherford, Tenafly, Teterboro, and that portion of the county of Hudson embracing North Bergen, Secaucus and Union City, and that non-contiguous part of the township of South Hackensack bounded by Carlstadt, Moonachie, Little Ferry and the Hackensack River, shall constitute and be called the Ninth District.

Tenth. That portion of the county of Essex embracing East Orange, Glen Ridge, Newark, and that portion of the county of Hudson embracing Harrison, shall constitute and be called the Tenth Distict.

Eleventh. That portion of the county of Bergen embracing North Arlington, and that portion of the county of Essex not contained in the Fifth and Tenth Districts, and that portion of the county of Passaic embracing Little Falls, West Paterson, and that portion of the county of Union embracing Hillside, shall constitute and be called the Eleventh District.

Twelfth. All that portion of the county of Union not contained in the Eleventh and Fifteenth Districts, shall constitute and be called the Twelfth District.

Thirteenth. The counties of Hunterdon, Sussex and Warren, and that portion of the county of Mercer embracing Ewing, Hopewell borough, Hopewell township, Pennington borough, and that portion of the county of Morris not contained in the Fifth District, shall constitute and be called the Thirteenth District.

Fourteenth. All that portion of the county of Hudson not contained in the Ninth and Tenth Districts, shall constitute and be called the Fourteenth District.

Fifteenth. All that portion of the county of Middlesex not contained in the Fourth and Fifth Districts, and that portion of the county of Union embracing Linden and Winfield township, shall constitute and be called the Fifteenth District.

Each party shall bear its own costs.

CLARKSON S. FISHER, J., dissents as to the scope of relief ordered, and reserves the right to file a Memorandum Opinion setting forth his reasons.

## OPINION

CLARKSON S. FISHER, District Judge (dissenting in part).

The factual and procedural history of this case is found in the majority opinion with which I agree except to the extent of the scope of the relief granted. The difficulties predicted for the District Courts by Justice Frankfurter dissenting in Baker v. Carr, 369 U.S. 186, at p. 266, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961), have become all too apparent in this case. The "political thicket" Colegrove v. Green, 328 U.S. 549, at p. 556, 66 S.Ct. 1198, 90 L.Ed. 1432 (1945) has become for us an impenetrable forest.

After finding N.J.S.A. C. 19:46–3 unconstitutional, we allowed the New Jersey Legislature ample opportunity to perform its duty in the congressional redistricting of the State. There were a number of bills then pending before the Legislature and indeed there was time to introduce new legislation, but the Legislature failed to come forth with a plan. It then became the awesome task of this Court to attempt this redistricting without facilities or staff and in an extremely limited time period. It was obvious that the Court could not possibly

have drawn its own plan under these extremely adverse conditions. We were forced to choose between a multitude of plans submitted to us by factions, political groups and individuals, all having their own fish to fry. Each of these plans was partisan, therefore it was inevitable that any plan chosen by this Court had to be partisan. My brothers and I labored hard to decide which plan was the most desirable and my only disagreement with the majority is on that basis.

It must be borne in mind at the outset that we are creating only an interim plan which will be changed as soon as the Legislature rouses from its lethargy after the November elections.

The last expression of the Supreme Court on this subject makes it clear that all criteria which have heretofore been used in redistricting cases must give way to the paramount consideration of population equality in the congressional districts, Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1968), although predictable population trends may be considered.

However, in achieving this result, the Court properly should be guided by other criteria and I am completely in accord with the majority that among these are contiguity and compactness of districts, preservation wherever possible of county and municipal lines, recognition of population changes and an eye to the previous legislative determination of appropriate districts. I further agree that at least to some extent these considerations should be balanced.

If we do not consider factors other than population equality, this will become a simple exercise in arithmetic.

In my view the plan which was patterned on Senate Bill 744 and refined by the Secretary of State to reduce the population deviation to a maximum of eight people over and seven people under the ideal district of 478,059 persons, was the

best of a bad lot. The deviation figures are as follows:

| DISTRICT | POPULATION [1] | DEVIATION [2] | % OF REL. DEV. |
|---|---|---|---|
| 1 | 478,054 | —5 | —.0011 |
| 2 | 478,067 | +8 | +.0017 |
| 3 | 478,060 | +1 | +.0002 |
| 4 | 478,065 | +6 | +.0013 |
| 5 | 478,058 | —1 | —.0002 |
| 6 | 478,059 | 0 | — |
| 7 | 478,052 | —7 | —.0015 |
| 8 | 478,057 | —2 | —.0004 |
| 9 | 478,059 | 0 | — |
| 10 | 478,055 | —4 | —.0008 |
| 11 | 478,061 | +2 | +.0004 |
| 12 | 478,067 | +8 | +.0017 |
| 13 | 478,057 | —2 | —.0004 |
| 14 | 478,052 | —7 | —.0015 |
| 15 | 478,062 | +3 | +.0006 |
| | 7,170,885 | 0 | .0008 |

[1] 1970 Federal Census
[2] From ideal: 478,059

The foregoing plan has minimal population deviation, it succeeds to some extent in preserving the county and municipal lines and it has the virtues of compactness and contiguity. Further, it realistically approaches the shifting population of this, the most densely populous state. In addition, this plan uses the so-called "core" approach which, using the prior districts as a beginning point, goes on to meet the one man—one vote mandate.

Although the majority gives no consideration to the fact that Senate 744 was the only legislative act which passed at least one house of the Legislature,[1] I feel that this should be a leading factor in our determination. Admittedly it was brought on the floor of the Assembly, failed and was withdrawn as a parliamentary tactic. It is, however, at least some expression of legislative will and would allow this Court to give at least a passing salute to Article 1, Section 2, Clause 3 of the Constitution of the United States. See Skolnick v. State Electoral Board of Illinois, 336 F.Supp. 839 (1971)

Senate Bill 827, which never got out of Senate Committee, has been selected as this Court's plan. When examined together with Senate 744 it is quite appar-

1. By our deadline for submission of plans.

ent that the draftsman of Senate 827 took Senate 744 as a starting point and changed southern districts to favor two incumbents at the expense of another. Granted, the Court's plan has alleviated an unfair situation in Hudson County and does keep municipal lines inviolate; however, I deem impropr the apparent structuring of the 10th and 11th districts on racial grounds.[2] In doing this it is noted that the draftsman drew the lines of the 11th district in such a fashion that it resembles nothing more than a Rorschach ink blot, and in selecting this plan, the majority has apparently deviated from the desired core approach and has adopted a plan which raises grave constitutional questions. Judge Pollack in rejecting a challenge to a New York Assembly districting plan which split a black community, argued:

" . . . (T)he complaint appears as an unabashed plea for segregation in the composition of Assembly Districts, for color consciousness rather than for color blindness. Speaking in a different context, Mr. Justice Douglas has emphasized the repugnance of such a plea to the principles of democracy: 'Racial boroughs (like rotten boroughs), are . . . at war with democratic standards.' Wright v. Rockefeller, 376 U.S. 52, 62, 84 S.Ct. 603, 609, 11 L.Ed.2d 512 (1964) (dissenting opinion).

Any purposeful attempt to maintain a majority of persons of one race within a given district would, in fact, raise grave constitutional questions. Wright v. Rockefeller, 211 F.Supp. 460, 468–469 (S.D.N.Y.1962) (concurring opinion of Feinberg, J.) aff'd. 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964)." Ince v. Rockefeller, 290 F.Supp. 878 (S.D.N.Y.1968).

It may be argued that in the past the black vote was purposely split on racial lines, that the legislature did not use ob-

jective criteria, but rather tried to deprive the blacks of representation. This may or may not be so. It is not for this Court to decide nor correct. No evidence of this nature was brought before us, nor are there any cases guiding the Court in correcting any such possible injustice. On the contrary, there are cases such as Ince v. Rockefeller, *supra,* and Wright v. Rockefeller, *supra,* holding that the Court cannot correct apportionment lines possibly drawn on a racial basis by drawing its own lines on that basis.

Once a core approach was adopted it should have been followed consistently. The racial lines of the 10th and 11th districts indicate otherwise.

For the above reasons, I respectfully dissent.

---

2. Under the plan adopted by the majority the population of the 10th District is 46.67% white and 52.33% non-white. Under that plan the 11th district is 92.80% white and only 7.08% non-white.

In contrast, the racial population of the 10th and 11th districts under N.J.S. 19:46–3 was approximately 69% white and 31% non-white in the 10th and 63% white and 37% non-white in the 11th.